UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FRED KLEINER,<br><br>　　　Plaintiff, on behalf of himself and all others similarly situated,<br><br>　　　　　- against -<br><br>CENGAGE LEARNING HOLDINGS II, INC., CENGAGE LEARNING, INC., and DOE AFFILIATED ENTITIES 1-10<br><br>　　　Defendants. | **CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

By and through his counsel of Slarskey LLC and Casner & Edwards LLP, Plaintiff alleges as follows for his complaint against Cengage Learning Holding II, Inc., Cengage Learning, Inc., and their parent, subsidiary, divisions, affiliates, and successors in interest, Doe Affiliated Entities 1-10 (collectively, "Defendants" or "Cengage").

## <u>NATURE OF CASE</u>

1. This is an action pursuant to Chapter 93A of the Massachusetts Consumer Protection Act, and the common law, arising out of the unfair and deceptive practices engaged in by Cengage—publishers of textbooks and other learning products authored by individuals like Plaintiff, Dr. Fred Kleiner.

2. Acting on his own behalf and on behalf of similarly-situated parties (the "Class Members"), Dr. Kleiner seeks to rectify Defendants' unfair and deceptive royalty-reporting practices, which are designed to conceal from authors that Defendants systematically underreport and underpay royalties due and owed to Class Members, in the range of 10-30% of the royalties earned. Based on Cengage's annual reported revenues approaching $1.5 billion, and

typical royalties amounts due to authors of 8-12% on sales, Cengage's practices conceal the underreporting of $12 – $18 million, annually, in underpaid royalties.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. § 1332(d), because there is diversity of citizenship between at least one class member and Defendants and the aggregate claims of the Class exceed the sum or value of $5,000,000. This action, therefore, falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C. §§ 1711-1715.

4. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2). Defendants maintain their principal place of business at 200 Pier Four Boulevard, Suite 400, Boston, Massachusetts, and conduct a substantial amount of business in this District, including contracting with members of the Class, and the sale and distribution of Plaintiff's works. In the past year, Defendants have sold millions of dollars' worth of textbooks (including rentals and subscription fees), and other types of books, in this District.

## PARTIES

5. Dr. Fred Kleiner ("Plaintiff") resides in Woodbridge, Connecticut, and is a party to various agreements and amendments, including but not limited to those dated September 9, 2005, June 6, 2009, and February 14, 2012, respectively, all initially entered into with Wadsworth Publishing Company ("Wadsworth"). Wadsworth is Cengage's predecessor in interest to these agreements, which cover the publication of certain works authored by Dr. Kleiner, including, among others, *Gardner's Art through the Ages: A Global History*. Plaintiff is a Professor Emeritus of History of Art, Architecture, and Archaeology at Boston University, where he taught until his retirement in 2020.

6. Cengage Learning Holdings II, Inc., ("Cengage Holdings"), together with its subsidiaries, including Cengage Learning, Inc. ("Cengage Learning"), operates as a publisher and distributor for higher education textbooks, print, and electronic learning aids.

7. Cengage Learning, Inc. is a Delaware corporation registered to do business in the Commonwealth of Massachusetts with its principal place of business at 200 Pier Four Boulevard, Suite 400, Boston, Massachusetts.

8. Doe Affiliated Entities 1-10 are Cengage affiliates or subsidiaries that act as counterparties to various Publishing Agreements with Class Members for the benefit of Cengage. Each entity is controlled by Cengage, with its principal place of business at 200 Pier Four Boulevard, Suite 400, Boston, Massachusetts.

## FACTUAL ALLEGATIONS

A.  **Typical Publishing Agreements**

9. Cengage is a publisher, seller, and distributor of textbooks and learning-materials, and emphasizes the provision of academic materials for use in institutions of higher learning.

10. Historically, the Cengage business model has entailed obtaining publishing agreement contracts with academic authors (often professors), pursuant to which: (1) the author agrees to produce an academic textbook for the publisher, and transfers some or all of the copyright rights to the publisher; (2) the publisher, in turn, agrees to publish, market, sell, and distribute the work; and (3) the author earns a per-sale percentage royalty on the net revenue from his or her work (each such agreement, generally, a "Publishing Agreement"). The remainder of the revenue is kept by Cengage.

11. Though royalty percentages are typically in the range of 8-12% based on net sales revenue, the specific royalty percentage applicable to each work is dependent upon the

3

terms of the corresponding Publishing Agreement. Publishing Agreements typically include an escalator provision, whereby the applicable royalty percentage increases as the total number of units sold to date increases.

12. For example, Plaintiff's September 9, 2005 Publishing Agreement ("2005 Publishing Agreement"), contains two escalator levels whereby his royal percentage increases by a fixed percentage upon reaching a specified number of aggregate units sold to date.[1]

13. Thus, essential to correctly calculating royalty payments is: (1) a clear and accurate count of the number of units of each work sold to date, which is identified by International Standard Book Number ("ISBN"), a unique 10- or 13-digit numbers that identifies a specific book, edition of a book, or a book-like product (such as an e-Book or audio book); (2) the price for each such sale; and (3) the amount of any appropriate deductions from the proceeds of the sales prior to applying the royalty rate.

14. Typical of the Publishing Agreements, Plaintiff's 2005 Publishing Agreement imposes a recordkeeping and reporting obligation upon Cengage. Pursuant to the Publishing Agreement, Cengage is obligated to "report on the sale of the Work in March and September of each year, for the six-month period ending the prior December 31 and June 30, respectively. With each report of sales, the Publisher will make payment for the balance shown to be due."

**B.    Cengage's Bankruptcy and Changes to Its Business Model**

15. The per-sale royalty model is typical of Publishing Agreements in higher education—both between Cengage and its authors and other publishers and their authors. Over

---

[1] Plaintiff has intentionally omitted the specific details of his 2005 Publishing Agreement because he subsequently agreed with Cengage to an amendment thereto which purports to preclude him from disclosing certain terms and conditions thereof.

4

the years, Cengage has become the successor in interest to thousands of Publishing Agreements with substantially-similar royalty payment terms, as it has acquired or merged with other publishers.

16. In recent years, however, the textbook publishing industry has begun to adapt to significant technology shocks associated with digital distribution of textbooks.

17. A shift in technological reliance and trends, according to Cengage, has had an adverse effect on the profitability of publishing hard copy books.

18. In part as a result of changes in the economics of the textbook market, in July 2013 Cengage Limited filed for bankruptcy protection. The company emerged from bankruptcy in April 2014, relieved of much of its debt, and having secured billions of dollars in exit funding.

**C.   Cengage Unlimited and MindTap**

19. At the time Cengage emerged from bankruptcy, Cengage's CEO, Michael Hansen, was interviewed by the noted publication, "Inside Higher Ed." In that interview, Hansen stated that there was a "growing awareness in all positions of [Cengage] that the model that used to make Cengage successful . . . is no longer in place" and that the reorganized Cengage would be "much closer to a software company than a traditional publisher."

20. Among other changes, Cengage set out to deliberately undermine the royalty-for-sale model typically written into its contracts with authors.

21. Shortly after emerging from bankruptcy, Cengage introduced Cengage Unlimited. Cengage Unlimited is an all access, on-demand electronic subscription model that permits users to obtain electronic access to Cengage's catalog of thousands of titles. Instead of buying individual books for a particular higher education course, students can pay a single-price subscription fee per semester for access to Cengage's entire electronic catalog.

22. Because, under the Cengage Unlimited model, Cengage does not "sell" units of authors' works as contemplated by typical Publishing Agreements, Cengage designed a new method of calculating royalties owed to authors based on the subscription model.

23. Under the Cengage Unlimited model, Cengage allocates some or all of its subscription fees into several different "Revenue Pools" based upon the types of material included with Cengage Unlimited access (*i.e.*, courseware supplements, e-books, or print rental).

24. Cengage assigns each of its authors' works into one of the Revenue Pools and pays authors royalties from the Revenue Pool based upon a function of several variables including (1) the author's contractually agreed upon royalty rate; and (2) the number of "uses" of the book; and (3) the net price as a percentage of the total for each title and product type.

25. In other words, the amount of royalties paid to authors for the use of their works on Cengage Unlimited depends not on the number of *sales* of the title, but on the relative *use* of a title, as compared to other titles in the same Revenue Pool.

26. Cengage, however, has not disclosed to authors the details of the methodology and formula by which it allocates its subscription fees among the Revenue Pools, and further, has not provided to authors the number or identity of the authors or specific works that have been placed in each Revenue Pool.

27. As part of its technological pivot, Cengage also created digital courseware supplements, including "MindTap," an online learning platform. Typically, these courseware supplements begin with and are based upon an author's work, and package the author's work in a digital format, with homework, quizzes, tests, and multimedia materials that are intended to enhance the learning experience. The supplemental materials are typically derivative of the author's work.

28. Cengage determines the royalty payments owed to authors on courseware sales by subjectively allocating value in the courseware to the digital framework, packaging, and supplements it purports to have created, and thereby reducing the basis upon which the royalty percentage is paid.

29. In other words, when calculating royalties for coursework sales, Cengage applies the royalty percentage from the Publishing Agreements only to that portion of the sales revenues that it deems to be associated with the work produced subject to the Publishing Agreement; Cengage does not pay any royalty on the balance of the MindTap sales revenue, which it has determined to be associated with its own contribution to the digital packaging and supplement.

30. Digital courseware, like MindTap, constitutes one of the Revenue Pools utilized under the Cengage Unlimited business model. Cengage has not disclosed to authors the methodology by which it allocates its subscription fees among the Revenue Pools, and has not provided to authors the number or identity of the authors or specific works that have been placed into each Revenue Pool.

**D.    Cengage's Deceptively Designed and Misleading Royalty Statements**

31. Historically, Cengage has provided authors, including Plaintiff, with a twice-annual statement of royalties paid on published works. These statements are incomplete, confusing, and conceal from authors the information they need to reasonably determine whether their royalties have been paid based on fair and accurate calculations. As a few examples:

32. Royalty statements contain multiple ISBNs for the same underlying work, without explanation, along with unexplained acronyms.

33. Cengage routinely records "adjustments" to royalty revenue on its royalty statements, without explanation. These adjustments can reflect significant credits or withholdings

to an author based on unexplained errors that Cengage has purportedly made in the past, sometimes in favor of authors, and sometimes in favor of the publisher. The regular occurrence of these "adjustments" indicates the irregularity and unreliability of Cengage's royalty reporting practices.

34. Cengage's introduction of Cengage Unlimited has exacerbated the problem, as royalty statements have become longer, more complicated, and less comprehensible.

35. A review of one of Plaintiff's recent royalty statements, which is demonstrative of the royalty statements that Cengage provided to Plaintiff, illustrates some of the issues.

36. Plaintiff's July – December 2020 royalty statement ("Statement") was approximately 320 pages, and purported to contain various information related to the sale and rental of his books, as well as the access of his work through Cengage Unlimited.

37. The information, however, is largely incomprehensible without unique expertise in the publishing industry, and is at times completely illogical, including, but not limited to, the following examples.

38. First, book "rental" unit prices for the same edition of certain books, and thus the aggregate revenue attributable to those rentals, vary wildly without explanation, including price differences in some cases of nearly 800%. Even more confusing, Cengage sometimes reports revenue even when "0" units of a particular book were sold.

39. Second, like book "rental" unit prices, Cengage Unlimited subscription "unit" prices for the same edition of certain books, and thus the aggregate revenue attributable to those subscriptions, varies wildly without explanation, including price differences in some cases of nearly 600%.

40. The Statement does not provide a definition for a Cengage Unlimited "unit" or any explanation for how (or if) this measurement metric correlates to the purchase of an e-book, the use of MindTap, or the length of a subscription period.

41. With regard to Cengage Unlimited, the Statement does not disclose the formula pursuant to which royalties are calculated. Cengage does not disclose how many authors, which authors, or which works were included in the Revenue Pool to which Plaintiff's work had been assigned, the allocation of revenues, or how the respective royalty share is calculated.

42. Although the Statement contains a fillable field for "units, inception to date," that field is blank, thus concealing information necessary to determine if, or when, Plaintiff reached an escalator level under Plaintiff's 2005 Publishing Agreement (*i.e.*, the level of sales that triggers a higher royalty rate as greater numbers of units are sold).

43. As a result of the above issues, and despite Plaintiff's examination of the lengthy Statement, it is effectively impossible for Plaintiff to determine whether his royalty payments for the reported period are accurate.

44. Nonetheless, it is obvious that the Statement has errors.

45. By way of example, based on certain per-unit revenue figures, Cengage inaccurately reported the aggregate number of "rental" units for the applicable period. More specifically, according to the Statement, Plaintiff's book, *Gardner's Art through the Ages: A Global History*, 16th edition, produced the following variations of rental units/revenue per-unit/ total revenue figures:

        a.     1,782 rental units at $31.46/unit = $56,062.61 total revenue;

        b.     1 rental unit at $252.91/unit = $252.91 total revenue; and

    c. 0 rental units at $383.88/unit = $383.88 total revenue.

  46. Upon information and belief, "0" rental units did not net Cengage hundreds of dollars in revenue. Similarly, upon information and belief, "1" rental unit did not produce $252.91 in revenue, because the book retails for far less than $252.91.

  47. Incomprehensible revenue and unit reporting not only renders the Statement inherently incredible, but the reported figures indicate that Cengage has depressed Plaintiff's aggregate unit counts for purposes of his royalty percentage escalator, and thus, over time, his net royalties. In other words, if Cengage had accurately reported the rental unit amounts, the total "units, inception to date" would be higher, thus inching Plaintiff closer to his next escalator level and the triggering of a higher royalty rate.

  48. Seeking to understand precisely how his royalties are calculated, and in pursuit of an explanation for the data provided in prior royalty statements, Plaintiff requested additional information from Cengage, including access to the underlying sales and royalty data in readily usable form for purposes of determining the validity of Cengage's royalty calculations.

  49. After months of back and forth with his "Author Relations" representative and various other Cengage finance and accounting personnel, Plaintiff became frustrated with efforts to understand the statements and validate the royalties paid to him, as Cengage provided only slices of data that do not answer how, for example, Cengage Unlimited royalties are determined for his work, and whether the methodology for calculating royalties is fair and accurate.

**E. Cengage's Deceptively Designed "Author Relations" Program**

  50. Cengage's false, misleading, and unfairly opaque royalty statements are part of a broader practice designed and implemented by Cengage to dissuade authors from

10

questioning the accuracy of their royalty statements, and to conceal the fact that—upon information and belief—Cengage systematically underpays author royalties 10-30%.

51. Cengage's "Author Relations" team manages author relationships and is typically the initial recipient of author inquiries about Cengage's semi-annual royalty statements.

52. Upon information and belief, Cengage receives many inquiries about the contents of its royalty statements, and thus is aware that its royalty statements actively confuse authors.

53. Rather than seek to clarify its statement practices, however, over the past several years, Cengage has used its "Author Relations" unit to perpetuate author confusion about royalty payment practices.

54. For authors who earn enough royalties such that a 10-30% reduction in royalties constitutes a significant gross reduction in royalties, some of those authors have retained accounting and legal professionals with expertise, and tasked those individuals with obtaining more information from Cengage to explain Cengage's royalty statements and verifying the accuracy of the royalty payment practices. Other authors contact Cengage directly.

55. Since emerging from bankruptcy, Cengage has changed its policy and practices with respect to responding to, and cooperating with, author requests about royalty accuracy.

56. After years of cooperating with the requests of outside professionals (including auditors, accountants, and attorneys), Cengage has developed a practice of refusing to supply outside professionals with information, and has deliberately "blackballed" industry professionals that Cengage believes represent a threat to uncover its unfair royalty reporting practices.

57. Cengage has developed a policy and/or practice of deliberately refusing to supply complete or direct information in response to inquiries, and instead supplies minimal or confusing information that does not adequately address the questions from authors and leads to further inquiry.

58. As a matter of practice, Cengage avoids inquiries about the contents of its royalty statements, delays responses and—when it does respond—provides insufficient information from which to answer the authors' questions.

59. When Cengage does respond to author inquiries, it typically does so only after multiple requests, or after delaying the process, with the objective that authors will tire of their inquiries or lose interest in seeking clarification.

60. Upon information and belief, Cengage has created inordinate amounts of turnover in the Cengage Author Relations department, which Cengage has used as a means of further delaying responsiveness and confusing authors as to whether and how they are able to get accurate information in response to their inquiries.

61. Upon information and belief, at various times Cengage has organized its Author Relations team to report through the office of its general counsel, for the purpose of attempting to cloak author inquiries, and its response to author inquiries, in attorney-client or work product privilege. Responding to author inquiries about royalty calculations is a regular function of the Author Relations team, however, such that communications are not generally subject to attorney-based privileges.

62. As for inquiries about Cengage Unlimited and MindTap calculations, Cengage does not provide adequate information to authors—even when they make specific inquiries—from which to determine the basis of Cengage's royalty calculations.

63. Where Cengage *has* cooperated with audits of its royalty statements—as in instances where an author has "audit rights," with which Cengage must comply—Cengage has become sensitized to the fact that its royalty payment practices, and statements reflecting royalty payments, systematically underreport and underpay royalties in the range of 10-30%.

64. Cengage accordingly knows that its royalty statements systematically conceal the underpayment of 10-30% on author royalties. Cengage's delay tactics, failure to disclose sufficient information so that authors can understand their royalty statements, and incomplete and misleading responses to information requests are designed to perpetuate underpayments—whether by policy or practice—and accordingly constitute an unfair business practice under Massachusetts law.

F. **Class Allegations – Chapter 93A Claim**

65. Plaintiff has brought this action as a nationwide class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP"), on behalf of himself and all other authors, and/or respective successors in interest, who have entered into Publishing Agreements with Cengage (or any of its predecessors in interest), contracted for the payment of royalties based on the sale of their works, received semi-annual royalty statements from Cengage identifying the royalty payments issued for the applicable time-periods (the "Class," and each member a "Class Member"). Excluded from the Class are Defendants, and any person, firm, trust, corporation, or other entity related to or affiliated with Defendants, including, without limitation, persons who are officers, director, employees, associates, or partners of Cengage.

66. This action satisfies the requirements of FRCP 23 and is properly maintained as a class action.

67. Courts have previously upheld complaints brought by authors against publishers on a class basis, based upon common terms in various publishing agreements and

common practices by the publisher, to the extent that the plaintiffs seek to determine common issues of law and fact affecting the class.

68. The Class is so numerous that joinder of all members is impracticable and the disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Upon information and belief, thousands of persons have entered into Publishing Agreements with Cengage or its predecessors in interest, have bargained for the publisher to pay royalties on their works, and receive semi-annual royalty statements which purport to depict an accurate calculation of the royalties earned by the authors.

69. There are questions of law and fact that are common to the Class and which predominate over questions affecting any individual Class Member. The common questions of law and fact include, without limitation:

   a. Whether Cengage has designed its royalty reporting practices deliberately to obscure and conceal its royalty calculation methodology and systematic underpayment of royalties;

   b. Whether, in response to author requests, Cengage deliberately refuses to provide additional information and/or data, provides misleading partial responses, or delays responding to inquiries all to obscure, conceal, and perpetuate its royalty calculation methodology and systematic underpayment of royalties;

   c. Whether Cengage should be obligated to revise its royalty reporting statements so as to clearly set forth the basis for its royalty calculations, including the basis and reason for any adjustments, and units sold;

   d. Whether Cengage should be obligated to disclose clearly its sales and price data, and royalty calculation methodology, so that authors can verify the royalty calculation methodology and proper payment of royalties;

   e. Whether Class Members have sustained damages in the form of underpaid and uncollected royalties as a result of Cengage's issuance of its deceptively designed royalty statements;

70. Plaintiff's Chapter 93A claims are typical of the claims of the Class and Plaintiff has no interest adverse or antagonistic to the interests of other members of the Class.

71. Plaintiff will fairly and adequately protect the interests of the Class and has retained experienced counsel, competent in the prosecution of class action litigation.

72. A class action is superior to other methods for the fair and efficient adjudication of the claims asserted herein. Plaintiff does not anticipate that unusual difficulties are likely to be encountered in the management of this class action.

73. A class action will permit a large number of similarly situated persons to prosecute their common claims in a single forum, simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender, or the inconsistency in results that might occur if the claims were litigated independently.

74. As a result of Cengage's policy or widespread practice of issuing deceptively designed and misleading royalty statements in order to shield their underpayment of royalties and refusing to provide authors with the requested data necessary to determine the methodology and validity of the royalty calculations, Cengage is acting on grounds generally applicable to the entire Class, thereby making appropriate final injunctive relief, with respect to the Class as a whole.

75. Counsel for Plaintiff are skilled and experienced counsel, willing and able to proceed on behalf of the entire class and represent the interests of the class fairly.

## COUNT I
## VIOLATION OF MASSACHUSETS CONSUMER PROTECTION ACT CHAPTER 93A
**(On behalf of Plaintiff and the Class)**

76. Plaintiff repeats each and every allegation in the preceding paragraphs as if fully set forth herein.

77. At all material times, Cengage was located, and maintains its headquarters, in Massachusetts, where its royalty calculation, payment, and reporting policies and practices are engineered. Cengage's Author Relations team reports to management based in Boston, Massachusetts. Likewise, a substantial amount of the discussions between Plaintiff and Cengage representatives concerning the royalty statements took place in Massachusetts, including through Plaintiff's use of his Boston University email domain.

78. Cengage has designed its policies and practices regarding royalty calculation, reporting, and response to author inquiries to conceal from authors the basis and inaccuracies of Cengage's royalty-payment practices, which has perpetuated a system in which Cengage systematically underpays its authors and avoids accountability for the underpayments.

79. The acts and/or omissions of Cengage set forth in this complaint constitute unfair and deceptive acts and practices within the meaning of M.G.L. ch. 93A §§ 2, 11, and the regulations of the Attorney General promulgated pursuant thereto.

80. As a direct and proximate result of these unfair and deceptive acts and practices, Plaintiff and the Class have suffered substantial injury and damage, including the perpetual undercounting of their royalty payments in violation of their respective publishing agreements, and are entitled to a recovery from Cengage, whether in statutory or actual damages, and including costs and attorney's fees to prosecute this action.

81. Further, Cengage's acts and/or omissions were willful and knowing violations of M.G.L. ch. 93A § 2 within the meaning of M.G.L. ch. 93A § 11, entitling Plaintiff and the Class to treble damages.

82. Prior to bringing suit, Dr. Kleiner had extensive correspondence with Cengage, indicating his confusion and his complaints about Cengage's royalty statements and

related business practices. In that correspondence, Dr. Kleiner indicated that if a resolution could not be reached, he would take legal action.

## JURY DEMAND

83. Pursuant to Fed. R. Civ. P. 38, Plaintiff and the Class demand a trial by jury on all issues properly so triable.

WHEREFORE, Plaintiff and the Class pray for judgment accordingly:

A. A determination that this action is properly maintainable as a class action, and certifying Plaintiff as Class representative;

B. Declaratory and injunctive relief requiring Cengage to disclose clearly its royalty calculation methodology for its Cengage Unlimited model and MindTap royalty calculations;

C. Declaratory and injunctive relief requiring Cengage to provide reasonable disclosure of sales and royalty-related information in connection with its royalty statements, and in a form to be approved by the Court;

D. Actual and/or statutory damages to Plaintiff and the Class in an amount to be proved at trial, along with treble damages, based upon Cengage's willful and knowing violations of M.G.L. ch. 93A §§ 2, 11.

E. Pre- and post-judgment interest;

F. Plaintiff and Class costs of this action, including reasonable attorneys' fees and expenses, pursuant to M.G.L. ch. 93A §§ 2, 11; and

G. Such other and further relief as the Court may deem just and proper for the Plaintiff and the Class.

| | |
|---|---|
| Dated: New York, NY<br>February 14, 2022 | CASNER & EDWARDS LLP<br><br>By: *Edward V. Colbert III*<br>Edward V. Colbert<br>303 Congress Street<br>Boston, MA 02210<br>(617) 426-5900<br>*Counsel for Plaintiff*<br><br>SLARSKEY LLC<br>David Slarskey<br>Richard Weingarten<br>420 Lexington Avenue, Suite 2525<br>New York, NY 10170<br>(212) 658-0661<br>*Counsel for Plaintiff*<br>*Pro hac vice applications pending* |